WELCH, J.
L.The defendant/appellant, Moriah Technologies, Inc. (“Moriah”), appeals a judgment from the Office of Workers’ Compensation (“OWC”) awarding the plaintiffiappellee, Adam O’Bannon (“plaintiff’), indemnity benefits, medical benefits, penalties and attorney fees. Additionally, both Moriah and the plaintiff challenge the workers’ compensation judge’s (“WCJ”) finding that it did not have subject matter jurisdiction over claims against defendant/appellee, Texas Mutual Insurance Company (“TMIC”). For reasons that follow, we affirm in part and reverse in part, and remand this matter for further proceedings.
FACTUAL AND PROCEDURAL HISTORY
The instant appeal arises out of a workers’ compensation claim filed by the plaintiff seeking benefits in connection with a pulmonary embolism he suffered after working on a cellular telephone tower in the course of his employment with the defendant, Moriah.
*131 Moriah is a Texas corporation that provides installation services in the cellular telephone tower industry. The plaintiff began working for Moriah on November 28, 2011. After being contacted by a former colleague regarding a job opening at Moriah, the plaintiff flew to Texas on November 28, 2011, at his own expense, to meet with Randall Morgan, the president of Moriah.[1] During their initial meeting, the plaintiff and Mr. Morgan discussed the nature of the position. They further reached an agreement as to an hourly rate of pay that the plaintiff would receive. At that time, the plaintiff was provided a packet of four employment documents, including an independent contractor agreement, 1099 Contractor Terms form, a W-9 tax form, and a mutual confidentiality agreement. The plaintiff took the independent contractor agreement and mutual confidentiality,| ^agreement with him to review, and he signed and returned the mutual confidentiality agreement, but never returned a signed copy of the independent contractor agreement. Immediately following the November 28, 2011 meeting, at Moriah’s direction, the plaintiff departed for Tennessee to begin work after being provided with a company-owned pick-up truck and assorted equipment.
During the timeframe relevant herein, Moriah’s main client was NSORO, another installation service provider contractor. AT & T contracted with NSORO to service and maintain cellular telephone towers. Initially, the plaintiff was assigned by Mo-riah to work on the “Tiger Team” at the direction of NSORO or AT <& T. While on the Tiger Team, the plaintiff and one “climber,” who was selected and paid by Moriah, would perform short-term testing and maintenance projects at various towers, sometimes performing multiple jobs in one day
After several months of working on the Tiger Team, the plaintiff was assigned by Moriah to a crew of three to'four men, who were also selected and paid by Moriah, to perform UMTS upgrades on cellular phone antennas. The UMTS upgrades required the crew to work at one job site for several weeks at a time. At all times relevant herein, a majority of Moriah’s work was performed for NSORO in Texas, Tennessee, "and Louisiana. The majority of the jobs that the plaintiff worked on were located in Tennessee and Louisiana.
The disputed accident herein occurred while the plaintiff was working on a UMTS upgrade project in Napoleonville, Louisiana. The plaintiff alleges that on June 2, 2012, he spent approximately ten hours working on the tower. According to the plaintiff, the tower had an unusual and complex configuration that required him to sit on a small pipe with his dangling legs wrapped around the pipe to secure him for hours while performing work on six different antennas. Later that day, the plaintiff immediately drove four hours roundtrip to transport another worker and a piece of equipment to a job being undertaken in Jackson, Mississippi.
UThe plaintiff testified ¡"that bruises caused by sitting on the pipe appeared: on the backs of his thighs that night or the next day. However, noting .that it was not unusual to sustain minor injuries while working, the plaintiff testified that he continued working.. Qn, Sunday, June 17, 2012, the plaintiff sought treatment for rib pain at an emergency room in Many, Louisiana, while he was working on a job in that area. The plaintiff reported to the *132 medical staff that one day earlier he began experiencing pain in his ribcage. -The plaintiff was diagnosed with chest wall pain and released. The plaintiff returned to work the following day, and worked his last day on June 20,2012.
On the morning of June 21, 2012, the plaintiff called Mr. Morgan and informed him that he felt ill and would like to go home to Slidell. Mr. Morgan did not prohibit the plaintiff from going home. On June 22, 2012, the plaintiff reported to Doctors’ Urgent Care clinic, complaining of chest pain and difficulty breathing. Following testing that indicated the presence of a blood clot, the plaintiff was diagnosed with a pulmonary embolism and immediately hospitalized.
The plaintiff was hospitalized twice in connection with his pulmonary embolism in June and July of 2012. The medical records from his first hospitalization, June 22, 2012 to June 27, 2012, indicate that the plaintiffs pulmonary embolism was the result of deep venal thrombosis (“DVT”), or a deep blood clot, that dislodged and trav-elled to his lung. The plaintiffs hospital discharge records opine that the “likely cause” of the plaintiffs DVT was recent extended periods of sitting on a very narrow metal pipe under his thighs. Approximately one month later, the plaintiff was again hospitalized and underwent surgery after experiencing pleural effusion, or fluid build up in the lungs,- secondary to his earlier pulmonary embolism.
While hospitalized, the plaintiffs mother notified Moriah-that he had sustained a work-related injury. Moriah, in turn, submitted a claim to TMIC; its | ¿workers’ compensation coverage provider. On August 14, 2012, TMIC issued a letter to the plaintiff denying the claim on the grounds that the plaintiff did not sustain an injury in the course and scope of his employment, but rather, concluding that the plaintiff was suffering from an ordinary disease of life, • ■ , ;
On October 23, 2012, the plaintiff filed a disputed claim for compensation with the OWC in Louisiana against Moriah and TMIC. Moriah answered and denied that the plaintiff was entitled to any recovery under workers’ compensation on several grounds, including that the plaintiff was an independent contractor and the plaintiff did not suffer a compensable injury. TMIC initially responded to the plaintiff’s claim with an exception of lack of personal jurisdiction, -which was denied by the WCJ in an 'order dated May 1, 2013. TMIC later answered the plaintiffs disputed claim and denied liability on multiple grounds, including lack of coverage under its policy for the plaintiff’s claims and the plaintiff’s status as an independent contractor. TMIC also asserted'that the trial court lacked subject matter jurisdiction over the proceeding pursuant to terms contained in the' TMIC policy. On March 14; 2014, Moriah filed a cross-claim against TMIC seeking reimbursement for attorney fees and costs incurred in the defense of the matter, as well as for reimbursement of any benefits paid to the plaintiff by Moriah.[2]
The matter was tried on November 12, 2014. ' The-only witnesses called to testify live at trial were the plaintiff and Mr. Morgan, on behalf of Moriah. Issues presented for the WCJ’s consideration included (1) whether the plaintiff was an employee of Moriah; (2) whether an accident occurred; (3) 'whether the plaintiff sus *133 tained a perivascular or “traditional” injury; and (4) whether the WCJ had subject matter jurisdiction over the claims against TMIC.
lain a judgment signed on January 13, 2015, the WCJ found that the plaintiff was an employee of Moriah, who had sustained an injury as the result of the “physical trauma of acute bruising ” that arose out of and occurred in the course of his employment with Moriah. The WCJ further found that both the accident and injury sustained were “traditional” workers’ compensation accidents and injuries; therefore, the injury was not a perivascular injury covered under La. R.S. 23:1021(8)(e). However, the WCJ additionally found that even if La. R.S. 23:1021(8)(e) was determined to be applicable, the WCJ would have found that the plaintiff carried his burden of proving that the “physical work stress” caused his peri-vascular injury.
The WCJ cast Moriah in judgment -for indemnity, medical benefits and- expenses, penalties and attorney fees for its failure to timely pay indemnity and medical benefits under La. R.S. 23:1201(B) and 23:1201(E), and all costs associated with the proceedings.
On the issue of subject matter jurisdiction over the claims against TMIC by Mo-riah, the WCJ held that it did not have subject matter jurisdiction over Moriah’s claim against TMIC for reimbursement of workers’ compensation benefits- and dismissed Moriah’s claim against TMIC with prejudice.[3] -The WCJ found that the TMIC policy at issue was a reimbursement policy, wherein the scope and nature of coverage was governed by Texas law; therefore, questions regarding liability under the policy and applicability of the policy to the plaintiffs claims were for a Texas court to determine under Texas law.
hMoriah appeals the judgment of the WCJ.
ISSUES ON REVIEW
Moriah filed the instant appeal asserting four assignments of error to the WCJ’s judgment. First, Moriah avers that the WCJ erred in finding that it did not have subject matter jurisdiction over Moriah’s cross-claim against TMIC for reimbursement under the policy issued by TMIC. Second, Moriah contends that the WCJ erred in finding that the plaintiff was an employee, and not an independent contractor of Moriah. Third, Moriah challenges the WCJ’s finding that the plaintiff suffered a traditional accident in workers’ compensation as defined by La. R.S. 23:1021(1). Instead, Moriah contends any injury suffered by the plaintiff was a peri-vascular injury, and, thus, governed by the more heightened requirements contained in La. R.S. 23:1021(8)(e). Fourth, Moriah asserts that the WCJ’s finding that the plaintiff would have proved a compensable claim under La. R.S. 23:1021(8)(e) for a perivascular injury was -erroneous based on the evidence presented.
*134 The plaintiff timely filed an answer to the appeal seeking a “... reversal of the dismissal for lack of jurisdiction” of TMIC, as well as an increase in attorney fees and costs incurred as a result of this appeal.
STANDARD OF REVIEW
In a workers’ compensation case, the appellate court’s review of factual findings is governed by the manifest error or clearly wrong standard. Prine v. Coastal Bridge Company, L.L.C., 2013-1630 (La.App. 1st Cir.10/29/14), 157 So.3d 732, 738, citing Smith v. Louisiana Department of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Kennedy v. Security Industrial Insurance Company, 623 So.2d 174, 175 (La.App. 1st Cir.), writ denied, 629 So.2d 389 (La.1993). The two-part test for the appellate review of facts is: 1) whether there is a reasonable factual basis in the record for the finding of the WCJ, and 2) whether |sthe record establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
LAW AND DISCUSSION
I. Employment Relationship
Workers’ compensation is a remedy between an employer and an employee; thus, absent an employer-employee relationship generally there can be no compensation recovery. Johnson v. Alexander, 419 So.2d 451, 453-454 (La.1982). Louisiana Revised Statutes 23:1044 establishes a presumption that “[a] person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter.” An alleged employer can rebut this presumption by establishing that the individual was performing services as an independent contractor. See Hillman v. Comm-Care, Inc., 2001-1140 (La.1/15/02), 805 So.2d 1157, 1161.
The distinction between an employee and an independent contractor is a factual determination that must be decided on a case-by-case basis. Tower Credit, Inc. v. Carpenter, 2001-2875, (La.9/4/02), 825 So.2d 1125, 1129. In determining whether the relationship is one of principal and independent contractor, the courts consider, whether the following factors are present: (1) a valid contract between the parties; (2) the work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it; (3) the contract calls for specific piecework as a unit to be done according to the independent contractor’s own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;- (4) the existence of a specific price for the overall undertaking; and (5) the specific time or duration is agreed upon and not subject to termination at the will of either side without liability for its breach. See Tower Credit, Inc., 825 So.2d at 1129, citing Hickman v. Southern Pacific Transport Company, 262 La. 102, 117, 262 So.2d 385, 390-391 (1972).
The principal test in determining whether someone is an independent contractor is the degree of control over the work reserved by the employer. Hickman, 262 La. at 117, 262 So.2d at 391. This court has stated that “it is not the supervision and control actually exercised which is significant, but whether, from the nature of the relationship, the right to exercise such control exists.” Hulbert v. Democratic State Central Committee of Louisiana, 2010-1910 (La.App. 1st Cir.6/10/11), 68 So.3d 667, 670, writ denied, 2011-1520 (La.10/7/11), 71 So.3d 316. Yet, while the essence of the employer-employee relationship is the right to control; no one factor listed above is controlling, and *135 the court should consider the totality of the circumstances in determining whether an employer-employee relationship exists. Hulbert, 68 So.3d at 671. The burden of proof is on the party seeking to establish an employer-employee relationship. Hulbert, 68 So.3d at 670. We review these factors in the context .of the evidence presented to the WCJ at trial.
Valid Contract
While a valid contract is essential to finding an independent contractor relationship, there is no requirement that said agreement be in writing. See Hulbert, 68 So.3d at 671. Instead, it is sufficient to present evidence that there was a meeting of the minds, and that a valid oral contract was confected. Hulbert, 68 So.3d at 671. Here, contradictory evidence was presented at the trial regarding whether the parties had a meeting of the minds on the plaintiffs status as an independent contractor of Moriah.
It is undisputed that .the plaintiff took the independent contractor agreement and mutual confidentiality agreement initially provided to him on November 28, 2011 to review before signing, but never returned a signed copy of the independent | ^contractor agreement. The plaintiff testified at trial that he did not read or understand the independent contractor agreement he was provided by Moriah, but believed that the agreement dealt with confidentiality issues regarding technology. The plaintiff further testified that his understanding of the relationship with Mo- ’ riah required him to run the crew and do tower work for the company and receive an hourly rate for his services.
In contrast, Mr. Morgan testified at trial that he believed the plaintiff was an independent contractor. Mr. Morgan explained that Moriah only had two employees, himself and his assistant, and that all other workers were retained as independent contractors. Moriah further contends that the parties’ intent to enter into an independent contractor arrangement is evidenced by Moriah’s presenting the plaintiff with a copy of the independent contractor agreement at the initial November 28, 2011 meeting, not withholding income taxes on behalf of the plaintiff, and the requirement that the plaintiff provide his own hand tools. Mr. Morgan acknowledged at trial that he did not follow-up with the plaintiff to obtain a signed copy of the independent contractor agreement.
Control of Method and Manner
The plaintiff testified that he received his work assignments from the customer when working the job, but, ultimately, he would receive approval and direction from Moriah before proceeding to any job site. Upon completing a job, Moriah would also direct the plaintiff to a certain location to pick up certain supplies and to proceed to the next job. For example, it was Mr. Morgan who reassigned the plaintiff from Tiger Teams to UMTS upgrades. The plaintiff noted that he spoke with Mr. Morgan on a regular basis, sometimes up to ten times per day, during the beginning of his tenure with Moriah. At trial, the plaintiff described Mr. Morgan as the person “who made "our decisions for us.”
[uThe plaintiff did not have the power to hire and fire the crew members he worked with. However, as crew lead, the plaintiff was responsible for overseeing the crew hired by Moriah, interfacing with the. customer, and filling out daily reports memorializing the crew’s hours, mileage, and expenses, and photographically documenting the progress of .the job. The documentation and photographs were sent by the plaintiff to Moriah, who then provided that information to the client.
Moriah argues that it did not control the method and manner utilized by the plain *136 tiff in performing his job as crew lead. Moriah contends that the plaintiff received all of his assignments from a representative of its customer, and that Moriah never sent a representative to the jobsites to supervise or direct the plaintiff. Mr. Morgan testified that the plaintiffs work,. including hours worked, was directed by Mo-riah’s customers; and, in turn, that it was the plaintiffs, responsibility to direct the Moriah crew. Mr. Morgan testified that Moriah’s responsibility on projects was to oversee safety and the timely delivery of the end product to its customer. Mr. Morgan expressly denied ever directing the day-to-day activities of the plaintiff with respect to the running of the project. Further, Mr. Morgan testified that the plaintiff had the option of not taking a certain job when offered, but acknowledged that to do so would likely result in the plaintiff not receiving further work assignments from Moriah.
It is undisputed that the plaintiff was provided with an ATWdebit card by Mori-ah to cover his and the crew’s per diem expenses, hotel charges, necessary supplies, and any other miscellaneous charges incurred by the crew during a job. Further, there is no dispute that in addition to a pick-up truck, over the course of the plaintiffs tenure, Moriah also provided the plaintiff the use of a trailer, the supplies for each job, and certain equipment necessary for performing certain tasks on the towers, including an Anritsu tester valued at $10,000.00, rescüe rope, fire 1 ^.extinguishers, ’ first-aid kits, and connector tools. In contrast, the plaintiff provided ' his own hand tools, valued at under $1,000.00, and a safety-harness, which he purchased from Moriah.
While the testimony established that Moriah’s' customer had a prominent role in the actual supervision and control of the plaintiffs activities, the record as a wholé provides contradictory evidence as to the existence of Moriah’s actual right to exercise such control, as well as whether Mori-ah did exercise said right in certain instances and areas.
Specific Project — Specific Price
Moriah does not dispute that there was no agreement between the parties, even in the unsigned independent contract agreement, that the plaintiff would do a specific project for a specific price. The testimony of Mr. Morgan and the plaintiff at trial further established that the parties agreed to the plaintiff-receiving an hourly rate of $19.00 per hour for “normal hours” and overtime, in addition to $10.00 per hour for travel time. Thus, it is undisputed that the plaintiff was providing services for an hourly fee.
Duration of Work
Finally, Moriah does not specifically argue herein that the duration of the work herein was for a specific time, but does point out that the unsigned independent contractor agreement had a term of one year.[4] The plaintiff testified that Moriah crew members often left their positions at will. The plaintiff further testified that it was his understanding that he could quit working for Moriah at any time, and correspondingly, that Moriah could dismiss him anytime. Mr. Morgan | ^acknowledged in *137 his testimony that during the relevant times herein, he never pursued a breach of contract claim against a Moriah independent contractor who ceased working for Moriah before the end of the term of the agreement. Mr. Morgan explained that there would be no point because the individuals would be unable to pay damages.
Here, the determination of whether the plaintiff was an employee or an independent contractor involved the resolution of conflicting testimony as to the circumstances. Here, the WCJ heard conflicting testimony from the plaintiff and Mr. Morgan regarding the parties’ intent to enter into an independent contractor agreement, the duration of the agreement, .and the nature of the relationship between Moriah and the plaintiff in terms of control of manner and method. Upon-hearing the evidence, the WCJ-piade a factual determination that the plaintiff was an employee of Moriah. Based on the evidence presented,, we find no manifest error in the WCJ’s determination that the plaintiff met his burden of proving that he was an employee of Moriah. As such, we affirm the WCJ’s finding on this issue.
II. Accident and Injury
Generally, an employee must establish by a preponderance of the evidence that the accident was work-related, that the accident-caused'the injury, and that the injury caused disability. Hirstius v. Tropicare Service, LLC, 2011-1080 (La.App. 1st Cir.12/21/11), 80 So.3d 1215, 1216. An “accident” is defined in La. R.S. 23:1021(1) as follows:
“Accident” means an unexpected or unforeseen-actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at . the time objective findings of an injury -which is more than simply a gradual deterioration or progressive degeneration.
An “injury” is generally defined in La. R.S. 23:1021(8)(a) as follows:
1 u‘‘Injury” and “personal injuries” include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease" or derangement, however caused or contracted.
However, La. R.S. 23:1021(8)(e) places a heightened burden of proof and certain limits on the consideration of heart-related or perivascular injuries, and provides as follows:
(e) Heart-related or perivascular injuries. A héárt-related or perivascular injury, .illness, or death shall not be considered á personal injury by accident arising out Of and in the course of employment ¿nd is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence that:
(i) The physical work ’ stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and
(ii) The physical work stress or exertion, and not some other source of stress or preexisting, condition, was the predominant and major eause of the heart-related or perivascular injury," illness, or death. . . -
The Louisiana Supreme Court has recognized that not all cases in which the employee suffers a heart-related or peri-vascular injury fall -within the scope of La. R.S. 23:1021(8)(e). Specifically, the supreme court noted that La. R.S. 23:1021(8)(e) was not intended to apply to those “heart-related” or “perivascular” in *138 juries that directly result from some “physical impact” or “physical trauma” that arises out of and is incurred in the course and scope of employment. Hatcherson v. Diebold, Inc., 2000-3263 (La.5/15/01), 784 So.2d 1284, 1291 n. 9; Charles v. Travelers Insurance Company, 627 So.2d 1366, 1371 n. 15 (La.1993).[5] In these instances, the claims for workers’ compensation benefits are analyzed under general workers’ compensation principles. Populis v. Home Depot, Inc., 2007-2449 (La.App. 1st Cir.5/2/08), 991 So.2d 23, 26, writ denied, 2008-1155 (La.9/19/08), 992 So.2d 943; Osborn v. Unit Drilling Company, 2004-0014 (La.App. 1st Cir.6/25/04), 886 So.2d 495, 497.
On the issue of accident and injury, Moriah argues that the trial court erred in finding that the plaintiff proved the occurrence of a compensable accident, under La. R.S. 23:1021(1). In support of its position, Moriah points to the plaintiffs admission at trial that there was no accident in the sense that he hit something, fell, or ran into something. Further, Mori-ah suggests that discrepancies in the dates of the accident and injury referenced in plaintiffs disputed claim for compensation further undermine the plaintiffs assertions that an accident occurred.
Alternatively, Moriah argues that even if the plaintiff did prove that an injury causing event occurred, the resulting injury was perivascular and governed by the provisions of La. R.S. 23:1021(8)(e), including the heightened burden of proof contained therein. Based on the assumption that the plaintiffs injury was perivascular in nature, Moriah contends that plaintiff failed to establish by clear and convincing evidence that the physical work stress was extraordinary and unusual in comparison to that experienced by the average employee in that occupation. We disagree. For reasons set forth below, we find no error in the trial court’s finding that the plaintiff sustained accident and injury under La. R.S. 23:1021(1) and 23:1021(8)(a).
First, as noted above, in cases where a “perivascular” injury is the direct result from some physical impact that arises out of and is incurred in the course Inland scope of employment, the claims for workers’ compensation benefits are analyzed under general workers’ compensation principles. Populis, 991 So.2d at 26; Osborn, 886 So.2d at 497. Here, the plaintiffs testimony and medical evidence supports the WCJ’s finding that the plaintiffs DVT and resulting pulmonary embolism were the direct result of the physical impact of sitting on a pipe for ten hours, while per *139 forming work arising out of and in the course of his employment for Moriah.
The plaintiff’s testimony at trial established that on June 2, 2012, he worked ten hours perched on a pipe, and that he noticed soreness and bruising on the back of his thighs that night or the following day, but returned to work the following day. The plaintiff testified that he lacked the medical knowledge necessary to make the initial correlation between the bruising on the back of his thighs and his later pulmonary embolism.[6] The plaintiff testified that it was not until his medical care providers ruled out a hereditary predisposition towards embolisms and inquired further in to his work history that a connection was discovered between the bruising on his thighs and his pulmonary embolism.[7]
|17The submitted medical evidence and the depositions of the plaintiffs treating physicians support the plaintiffs testimony. Review of plaintiffs medical records related to his first hospitalization reveal that his physicians considered many variables in coming to the conclusion that his DVT and resulting pulmonary embolism were work-related. Factors considered included: the plaintiffs lack of recent surgeries,, the plaintiffs lack of family history for the condition, the fact that the plaintiff travelled long distances in a vehicle for work, and his extensive time in a harness while at work. The plaintiffs hospital discharge records opine that the “likely cause” of the DVT that lead to the plaintiffs pulmonary embolism was the plaintiffs recent extended periods of sitting on a very narrow metal pipe under his thighs. In his deposition, Dr. Randy J. Lamartini-ere, who treated the plaintiff during his first hospital stay, opined that he was eighty-percent certain that the combination of immobility and pressure on the plaintiffs legs resulted in the blood clot forming in the plaintiffs legs.
Dr. Francisco Candal, a pulmonologist, treated plaintiff during his subsequent lung i infection. In his deposition, Dr. Candal identified several risk factors for pulmonary embolism in the normal population, including inactivity, smoking,, hormonal birth control bills, and trauma. Dr. Candal testified that he was more focused on treating the plaintiffs condition than determining the initial cause. Dr. *140 Candal initially testified that he was not aware of all of the'events occurring immediately prior to the plaintiffs embolism; thus, in the absence of another risk factor, including trauma, he assumed that the plaintiffs condition was due to inactivity arid smoking. However, when asked to assume whether the plaintiffs DVT could have been caused by sitting on a thin piece of metal for hours, while wearing a harness, Dr. Candal opined “Oh, definitely.”
TMIC presented the deposition testimony of Dr. James E. Kelaher, who is board certified in internal rriedicine and occupational health. Dr. Kelaher testified |isthat he conducted a peer review of the plaintiffs CT angiogram report dated June 22, 2012, and all of the hospital records. Dr. Kelaher testified that based on his review of the records, he issued a report concluding that the plaintiffs condition was an ordinary condition of life. However, during his deposition, Dr. Kelaher was presented with the scenario, of the plaintiff sitting immobile for an extended period of time, and opined that he was unable to say with any certainty whether the cause of the plaintiffs condition was the work scenario presented or ordinary course of life.
Based on the above testimony and medical evidence submitted, we can find no manifest error in the WCJ’s finding that the plaintiff sustained an accident due to the physical trauma of sitting on a'small pipe for extended periods. Further, we cannot find that the WCJ erred in not applying-the heightened standard of care applicable to perivascular injuries. Our finding pretermits our consideration of Moriah’s fourth assignment of error asserting that the plaintiff failed to meet his burden of proof to prove a perivascular claim under La. R.S. 23:1021(8)(e).
III. Subject Matter Jurisdiction Over Claims Against TMIC .
Subject matter jurisdiction is the “legal power and authority of a court to hear and determine a particular class of actions or proceedings, based upon the object of the demand, the amount in dispute, or the value of the right asserted.” La. C.C.P. art. 2, Subject matter jurisdiction cannot be conferred or waived by the parties. La. C.C.P. arts, 2 and 3; Boudreaux v. State, Department of Transportation and Development, 2001-1329 (La.2/26/02), 815 So.2d 7, 12.
The Louisiana Constitution establishes the subject matter • jurisdiction of the Courts.. The subject matter jurisdiction of the district courts ,is set forth in La. Const, art. V, § 16(A)(1), which provides:
Except as otherwise authorized by this constitution or except as heretofore or hereafter provided by law for adminis.trative agency | ^determinations in worker’s compensation matters, a district court shall have original jurisdiction of all civil and criminal matters.
Louisiana . Revised Statutes 23:131Q.3(F) sets forth the jurisdiction of the workers’ compensation judgments, and provides in pertinent part as follows:
... [T]he workers’ compensation judge shall be vested with original, exclusive jurisdiction over all claims or disputes arising out of this Chapter, including but not limited to workers’ compensation insurance coverage disputes, group self-insurance indemnity contract disputes, employer demands for recovery for overpayment of benefits, the determination and recognition of employer credits as provided for in this Chapter, and cross-claims between employers or workers’ compensation insurers or self-insurance group funds' for indemnification or contribution, concursus proceedings pursuant to Louisiana Code of Civil *141 Procedure Articles 4651 et seq. concerning entitlement to workers’ compensation benefits, payment for medical treatment, or attorney fees arising out of an injury subject to this Chapter. [Emphasis added,]
The courts will not read La. R.S. 23:1310,3 more broadly than its explicit language since the general rule is that district courts are vested with original jurisdiction and. exceptions to this general rule are to be narrowly construed. See Broussard Physical Therapy v. Family Dollar Stores, Inc., 2008-1013 (La.12/2/08), 5 So.3d 812, 815-816. If the issue to be considered arises out of the Louisiana Workers’ Compensation Act, jurisdiction is vested in the OWC; if the issue merely relates to a workers’ compensation claim, the OWC does not have subject matter jurisdiction. TIG Insurance Company v. Louisiana Workers’ Compensation Corporation, 2004-2608 (La.App. 1st Cir.6/10/05), 917 So.2d 26, 27, writ denied, 2005-1821 (La.1/27/06), 922 So.2d 553.
Louisiana Revised Statutes 23:1310.3(F) expressly includes in its listing of matters “arising out of this Chapter,” “workers compensation insurance coverage disputes” and “cross-claims between employers or workers’ compensation insurers ... for indemnification or contribution.” The clear indication .is that, the legislature intended to • grant the OWC original, exclusive jurisdiction over coverage disputes, demands for employers’ or workers’ compensation insurers’ claims for ^indemnification, and contribution. TIG Insurance Company, 917 So.2d at 29. Further, we could find no ease law to support the assertion that the OWC is denied subject matter jurisdiction herein because the insurance policy herein may require the application of Texas law to determine coverage.[8] Even though éxcep-tions to the general rule that district courts are vested with original jurisdiction are to be narrowly construed, we find La. R.S. 23:1310.3 clearly and explicitly, places jurisdiction over the claims asserted by the plaintiff and Moriah against TMIC within the scope of the OWC’s jurisdiction. We remand this matter to the WJC for further proceedings in keeping with this decision.
Answer to Appeal
The plaintiff answered the appeal and requested additional attorney fees for the work necessitated by the appeal. Additional attorney fees are usually awarded on appeal when a party appeals, obtains no relief, and the appeal has necessitated additional work on the opposing *142 party’s counsel, provided that the opposing party appropriately requests an increase. Quick v. Terrebonne General Medical Center, 2009-1101 (La.App. 1st Cir.2/10/10), 35 So.3d 287, 290-291. For the work necessitated by the appeal, including reviewing the record, reviewing the appellate brief filed by Moriah, and preparing a response brief, we find that an ^additional $5,000.00 in attorney fees is warranted. Accordingly, the judgment of the trial court is hereby amended to provide for an additional attorney fee award.
CONCLUSION
For the above and foregoing reasons, we find as follows with respect to the WCJ’s January 13, 2015 judgment and March 31, 2016 supplemental and amending judgment. We affirm the WCJ’s finding that the plaintiff was an employee of Moriah, who suffered from an injury under La. R.S. 23:1021(8)(a) as the result of an accident as defined under La. R.S. 23:1021(1). The judgment of the OWC in favor of the plaintiff awarding attorney fees is hereby amended to award plaintiff, Adam O’Ban-non, additional attorney fees in the amount of $5,000.00 for the defense of this appeal. We vacate those portions of the WCJ’s judgments that held the WCJ had no subject matter jurisdiction over the claims asserted by the plaintiff and Moriah against TMIC, and this matter is remanded to the WCJ for further proceedings on that issue. In all other respects, we affirm the January 13, 2015 judgment. All costs of this appeal are to be split equally between the defendants, Moriah Technologies, Inc. and Texas Mutual Insurance Company.
AFFIRMED IN PART, VACATED IN PART, AMENDED IN PART, AND REMANDED.

. The plaintiff was living in Colorado when he began working, at Moriah; ■ however, he moved, to Louisiana shortly thereafter.

. Additionally, prior to the case going to trial, the Louisiana Department of Health and Hospitals ("DHH”) also filed a petition of intervention in connection with medical benefits paid on behalf of the plaintiff. DHH does not appear in the instant appeal as a party; thus, we do not consider its claims in the instant appeal.

. The judgment signed by the WCJ did. not address the claim asserted by the plaintiff against TMIC. Observing that the judgment failed to address or dismiss the plaintiffs claims against TMIC with proper decretal language, this court issued an interim order on March 21, 2016, directing the WCJ to rule on the plaintiff’s claim against TMIC. Additionally, the interim order invited the WCJ to submit a per curiam as to the reasons for its ruling as to the plaintiff's and Moriah's causes of action against TMIC, On April 6, 2016, the record was supplemented with an amended and supplemental final judgment dismissing the plaintiffs claims against TMIC with prejudice. The record was also supplemented with WCJ’s supplemental written reasons for final judgment addressing its decision to dismiss plaintiff’s and Moriah’s claims against TMIC.

. The unsigned independent contractor agreement set forth a term of one-year and defined the engagement between the parties as such, stating as follows:
Company hereby engages Contractor, and Contractor accepts engagement, to provide Company the following services: Services for the construction, installátion, commissioning and maintenance of microwave, cellular, and wireless broadband networks and other related duties as required and directed by the Company.

. In Charles, 627 So.2d at 1371, the supreme court, when examining the statute for the first time, noted in a footnote that there may be an exception to the heightened burden of care in La. R.S. 23:1021(8)(e) for perivascular injuries resulting from physical impact:
We think it obvious that La. R.S. 23:1021(7)(e) [now La. R.S. 23:1021(8)(e) ], by its focus on "physical work stress ” and preexisting conditions, was not intended to apply to those ''heart-related’’ or "perivas-cular” injuries which directly result from some physical impact which arises out of and is incurred in the course and scope of employment. For example, "heart-related” under 23:1021(7)(e) [now La. R.S. 23:1021(8)(e)] would not apply to the injury resulting from the puncture of an employee's chest and heart by a piece of equipment.
Regarding the scope of “perivascular,” we note it is medically possible for an aneurysm, embolism, or a severe bruise (which is technically an injury to a vessel) to result from a physical impact to a part of the body. For example, the blow of a falling piece of merchandise or equipment on a limb could cause an embolism or aneurysm at the point of impact. These types of injuries also would clearly not fall under the scope of La. R.S. 23:1021(7)(e) [now La. R.S. 23:1023(8)(e)]. [Emphasis added.]

. Where the employee is able to identify an event marking the time the injury occurred or the symptoms arose or suddenly or markedly increased in severity, even if such event occurs during the performance of customary or routine work activities, the employee has established an "accident” within the meaning of La. R.S. 23:1021(1). Begue v. Crossover, Inc., 2003-0267 (La.App. 1st Cir.11/21/03), 868 So.2d 100, 105. Moreover, an employee should not be barred from recovery because he did not realize or diagnose the full extent of his injury immediately after it happened. Mackie v. Crown Zellerbach Corporation, 444 So.2d 166, 171 (La.App. 1st Cir.1983).

. We note that a worker’s testimony alone may be sufficient to discharge his burden of proving an accident, provided two eleménts are satisfied: (1) no other evidence discredits or casts serious doubt upon the employee's version of the incident; and (2) the worker’s testimony is corroborated .by the circumstances following the alleged incident. Prine, 157 So.3d at 739, citing Bruno v. Harbert International, Inc., 593 So.2d 357, 361 (La.1992). Corroboration of the worker’s testimony may be provided by the testimony of coworkers, spouses, friends, or by medical evidence. Bruno, 593 So.2d at 361. Barring circumstances that cast suspicion on the reliability of the worker’s uncontradicted testimony, the court should accept the testimony as true when determining whether the worker has discharged his burden. Brown v. Kwok Wong, 2001-2525 (La.App. 1st Cir.12/20/02), 836 So.2d 315, 319. As set forth herein, no evidence was presented to cast doubt on the plaintiff's version of the accident, and the plaintiff’s version of the accident has been corroborated by medical evidence.

. An insurance policy is an agreement between the parties and is interpreted according to ordinary contract principles, Ledbetter v. Concord General Corp., 95-0809 (La.1/6/96), 665 So.2d 1166, 1169, judgment amended, 95-0809 (La.4/18/96), 671 So.2d 915. The contract is enforced as written when the language is clear and. unambiguous. La. C.C. art,2046; Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191, 197. It is well established that where the parties stipulate the state law governing the contract, Louisiana conflict of laws principles require that the stipulation be given effect, unless there is' statutory or jurisprudential law to the contrary or strong public policy considerations justifying the refusal to honor the contract as written. La. C.C. art. 3540 and its Revision Comments. Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A), 2001-2219 (La.App. 1st Cir.11/20/02), 837 So.2d 11, 42-43, writs denied, 2003-0418 (La.4/21/03), 841 So.2d 805 and 2003-0417, 2003-0427, 2003-0438 (La.5/16/03), 843 So.2d 1129, 1130. See also Melbert v. CompSource Oklahoma, 2014-356 (La.App. 3rd Cir.10/1/14), 149 So.3d 841, 845 (The Third Circuit upheld, the WCJ’s holding that Oklahoma employer’s workers’ compensation policy provided no coverage for the plaintiff’s injuries that occurred in Louisiana to a Louisiana resident, and that were covered under Louisiana workers’ compensation law.)